A05A1781. BAJJANI et al. v. GWINNETT COUNTY SCHOOL DISTRICT et al.
(630 SE2d 103)

PHIPPS, Judge.

Joe and Michelle Bajjani, individually and as parents and guardians of Timothy, filed suit against the Gwinnett County School District, Board of Education, members of the Board, Superintendent of Schools, and three individual employees[1] (principal, assistant principal, and clinic nurse) of North Gwinnett High School as the result of injuries suffered by Timothy when he was assaulted by a fellow student. The Bajjanis appeal from the trial court's grant of the defendants' motion for judgment on the pleadings. For reasons which follow, we reverse.

In this state, when

> deciding a motion for judgment on the pleadings, the issue is whether the undisputed facts appearing from the pleadings entitle the movant to judgment as a matter of law. All well-pleaded material allegations by the nonmovant are taken as true, and all denials by the movant are taken as false. But the trial court need not adopt a party's legal conclusions based on these facts.[2]

---

[1] Suit was initially filed against defendants in their individual and official capacities, but those claims made against them in their official capacity were voluntarily dismissed without prejudice.

[2] *Holsapple v. Smith,* 267 Ga. App. 17, 20 (1) (599 SE2d 28) (2004) (citations and punctuation omitted).

Thus, the question before us

> is whether the undisputed facts appearing from the pleadings indicate that [defendants are] entitled to judgment as a matter of law. Where the part[ies] moving for judgment on the pleadings [do] not introduce affidavits, depositions, or interrogatories in support of [their] motion, such motion is the equivalent of a motion to dismiss the complaint for failure to state a claim upon which relief can be granted. The motion to dismiss should not be granted unless the averments in the complaint disclose with certainty that the plaintiff[s] would not be entitled to relief under any state of facts which could be proved in support of [their] claim.[3]

We review a trial court's order dismissing a plaintiff's complaint de novo.[4]

\* \* \*

Here, the trial court accepted as true the following factual allegations of the Bajjanis:

On August 19, 2002, Timothy responded to a question posed by his fellow student Richard Bagley in an inflammatory way. The teacher heard Timothy's comment and responded. Several students heard Bagley threaten to beat Timothy in response to Timothy's remark. No further action was taken by the teacher and, when class ended, as soon as Timothy and Bagley left class, Bagley severely beat Timothy, including kicking him in the face and stomach and stomping on his head while he lay unconscious on the concrete floor.

Defendants John Green, the principal, and Roland Wallace, the assistant principal, arrived in the hallway where the attack occurred and found Timothy unconscious and bleeding profusely. They took him to the school clinic where defendant Susan Stephenson, the clinic nurse, cleaned his wounds. No other medical assistance was requested by school officials, but another assistant principal attempted to call Mr. and Mrs. Bajjani. Unable to reach them, he left messages for them that Timothy was okay, but the school needed to speak to them.

Mrs. Bajjani received the message and returned the call. Upon finding that Timothy had been injured, she went immediately to the school while Mr. Bajjani was on the phone with Green. Upon arriving,

---

[3] *Cox v. Turner*, 268 Ga. App. 305 (1) (601 SE2d 728) (2004) (citations omitted).
[4] *Moore v. BellSouth Mobility*, 243 Ga. App. 674, 675 (534 SE2d 133) (2000).

Mrs. Bajjani found Timothy still covered in blood, writhing in pain, begging for help, and unable to say what had happened to him.

Mrs. Bajjani took the phone and told her husband of Timothy's condition and that no medical assistance had been summoned. Mr. Bajjani then demanded that Green call 911 and, 40 minutes following the attack, Green did call 911. It was 49 minutes from the attack before medical assistance arrived and, during that time, spinal fluid was leaking out of Timothy's brain and he was vomiting blood. Because of the failure of any school official to immediately notify the proper police authority or to summon medical assistance, it was more than an hour and a half before treatment was begun at Gwinnett Medical Hospital, where Timothy was placed in the intensive care unit for traumatic brain injury. Further, because the school failed to notify the hospital of the severity of the attack, the true extent of his injuries was not discovered until hours later when a CT scan was performed.

Timothy's injuries included severe head trauma, a subdural hematoma, temporal skull fracture, and three facial fractures. As a result of the trauma and resulting leakage of spinal fluid due to the lack of immediate treatment, Timothy underwent surgery and extensive dental work, and suffers from seizures, inability to sleep, and difficulty eating.

Bagley, the assailant, had an extensive history of explosive, violent behavior, known to school officials and his parents. He had been involved in fights at the Mall of Georgia and numerous assaults on school premises. School officials failed to take measures to prevent further occurrences by warning teachers of Bagley's violent tendencies. As a result, the teacher ignored the threats made by Bagley toward Timothy.[5]

Under the federal No Child Left Behind Act, states must develop a definition of "persistently dangerous" schools and allow public school choice for students who attend a school that meets this definition. Georgia's definition of a persistently dangerous school includes one in which, for each of three consecutive years, "[a]t least one student enrolled in that school is found by official action to have committed an offense in violation of a school rule that involved one or more of the following criminal offenses . . . [a]ggravated battery . . ."[6] either on campus or at a school-sanctioned event.

Local school systems are required to report to the Georgia Department of Education incidents of criminal offenses and, each

---

[5] Bagley was ultimately arrested and convicted of aggravated battery.

[6] Ga. Dept. of Ed. Rule 160-4-8-.16 (1) (d) (1) (i).

year, the Department publicly identifies persistently dangerous public schools. Those schools must notify all parents or guardians that the school has been so designated and specify the process by which the student may transfer to a safe public school.

Because the publicity of such a designation is unwanted by local schools and school systems, it was widely known that Gwinnett County Public Schools repeatedly grossly underreported student discipline data used to determine the designation. In fact, in 2002, Gwinnett County reported only 4,258 of 70,138 disciplinary incidents, as admitted by Superintendent J. Alvin Wilbanks. This has resulted in an anti-reporting policy in Gwinnett County that discourages the accurate reporting of violent incidents and has impacted the way violent incidents are handled on school grounds, including the discouragement of requesting medical assistance for victims of violence. At North Gwinnett High School, teachers have been specifically instructed never to call 911 for any injury on school grounds.

\* \* \*

The complaint contains six counts. The first alleges negligent performance of ministerial duties required by OCGA § 20-2-1185 by failing to develop a security plan for North Gwinnett High School; by failing to have measures to ensure appropriate and timely medical response; by failing to have measures designed to warn teachers and students of dangerous students; and by failing to immediately notify appropriate authorities of the assault, as required by OCGA § 20-2-1184. Count 2 alleges that these actions were motivated by the desire to cover up incidents of this type and were wilful, malicious, and corrupt. Count 3 alleges that the failure to develop and implement an effective security plan, pursuant to OCGA § 20-2-1185, was wilful, wanton, malicious, and corrupt, arising from a systemic need to avoid publicity as an unsafe school system and local school. In Count 4, it is alleged that, by failing to seek immediate medical attention for Timothy, defendants failed to exercise ordinary care for his safety and failed to comply with OCGA § 20-2-1184 and the ministerial duties therein. Finally, Count 5 alleged that Wilbanks, the school board members, and Green discouraged reporting of violent incidents, thereby creating an environment at the local school level that amounted to a dangerous condition of which they were aware and which they failed to abate. Count 6 seeks punitive damages.

The Bajjanis' first four enumerations deal with the issue of official immunity and whether certain acts or failures to act were ministerial or discretionary and are considered together.

The doctrine of official immunity, also known as qualified immunity, offers public officers and employees limited protection from suit in their personal capacity. Qualified immunity protects individual public agents from personal liability for discretionary actions taken within the scope of their official authority, and done without wilfulness, malice, or corruption. Under Georgia law, a public officer or employee may be personally liable only for ministerial acts negligently performed or acts performed with malice or an intent to injure. The rationale for this immunity is to preserve the public employee's independence of action without fear of lawsuits and to prevent a review of his or her judgment in hindsight.[7]

A ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty. A discretionary act, however, calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed.[8]

In 1994, the "School Safety and Juvenile Justice Reform Act" was passed. Therein, it was "found and determined by the General Assembly . . . that: (1) The State of Georgia should ensure a safe and secure learning environment for its students and teachers and other school personnel."[9]

1. The first issue on appeal relates to that provision of the 1994 statute codified at OCGA § 20-2-1185, which provides, in pertinent part, that

(a) Every public school shall prepare a school safety plan to help curb the growing incidence of violence in schools, to respond effectively to such incidents, and to provide a safe learning environment for Georgia's children, teachers, and other school personnel. Such plan shall also address preparedness for natural disasters, hazardous materials[,] or radiological accidents, acts of violence, and acts of terrorism. . . . Such plans shall be reviewed and, if necessary, updated annually. Such plans of public schools shall be

---

[7] *Cameron v. Lang*, 274 Ga. 122, 123 (1) (549 SE2d 341) (2001) (citations and punctuation omitted); compare *Merrow v. Hawkins*, 266 Ga. 390, 392 (2) (467 SE2d 336) (1996).

[8] *Phillips v. Walls*, 242 Ga. App. 309, 311 (1) (529 SE2d 626) (2000) (citation omitted).

[9] Ga. L. 1994, p. 1012, § 2.

submitted to the local emergency management agency. . . .

(c) School safety plans prepared by public schools shall address security issues in school safety zones as defined in paragraph (1) of subsection (a) of Code Section 16-11-127.1 [generally prohibiting any person from possessing weapons in school safety zones, at school functions, or on school property].

The Bajjanis complain of the failure on the part of various of the defendants to develop a safety plan which addresses security issues mandated by the statute.

*Leake v. Murphy*[10] was an action against members of the Gwinnett County Board of Education, the Superintendent of the Gwinnett County School District, and the principal and various employees of a Gwinnett County elementary school by the parents of a student who had been attacked by a deranged individual at the school. In *Leake*, we reversed the trial court's dismissal of the claim against the board members and superintendent alleging failure to prepare a safety plan pursuant to OCGA § 20-2-1185.[11] We held that although the preparation of a school safety plan addressing security issues is a mandatory ministerial duty under OCGA § 20-2-1185, the development of its contents embraces discretionary functions.[12] We recognized, however, that the plan must address certain security issues.[13] We held that the absence of such a plan from the record necessitated reversal of the trial court's order on that issue.[14] We further held that if a motion for summary judgment were filed on remand, and if evidence of a plan that addressed security issues were presented, the superintendent and school board members would be entitled to official immunity.[15]

Although the Bajjanis acknowledge that a safety plan was developed for North Gwinnett High School, they alleged in their complaint and they assert on appeal that the plan does not address security issues mandated by OCGA § 20-2-1185. Therefore, as in *Leake*, the absence of a plan in the record necessitates the reversal of the trial court's entry of judgment on the pleadings against the Bajjanis on this claim.

[10] 274 Ga. App. 219 (617 SE2d 575) (2005).
[11] Id. at 221-224 (1).
[12] Id. at 224.
[13] Id. at 223.
[14] Id. at 224.
[15] Id.

2. Regarding the Bajjanis' claims against Green, Wallace, and Stephenson, we address the duties set out in the provision of the 1994 statute codified at OCGA § 20-2-1184, which provides, in pertinent part, that

> (a) Any teacher or other person employed at any public or private elementary or secondary school or any dean or public safety officer employed by a college or university who has *reasonable cause to believe* that a student at that school has committed any act upon school property or at any school function, which act is prohibited by any of the following: . . . (2) Code Section 16-5-24, relating to *aggravated battery*; . . . *shall immediately report* the act and the name of the student to the principal or president of that school or the principal's or president's designee.
>
> (b) The principal or designee who receives a report made pursuant to subsection (a) of this Code section who has *reasonable cause to believe* that the report is valid *shall make an oral report thereof immediately* by telephone or otherwise to the appropriate school system superintendent and to the appropriate police authority and district attorney.[16]
>
> . . .
>
> (d) Any person required to make a report pursuant to this Code section who knowingly and willfully fails to do so shall be guilty of a misdemeanor.

Under Georgia law, "[a] person commits the offense of aggravated battery when he or she maliciously causes bodily harm to another by depriving him or her of a member of his or her body, by rendering a member of his or her body useless, or by seriously disfiguring his or her body or a member thereof."[17] "Black's Law Dictionary defines 'disfigurement' as 'that which impairs or injures the appearance of a person' and defines 'serious' as 'grave or great.' To constitute the crime of aggravated battery, there is no requirement that, in addition to being 'serious,' the disfigurement of a victim be permanent."[18]

---

[16] (Emphases supplied.)

[17] OCGA § 16-5-24 (a).

[18] *In the Interest of H. S.*, 199 Ga. App. 481 (405 SE2d 323) (1991) (citation and punctuation omitted).

The Bajjanis' complaint alleges that the school principal should have reported this incident because he, along with the assistant principal and other unnamed school employees, found Timothy on the ground unconscious and bleeding profusely from his mouth and nose, after Timothy's assailant had viciously stomped on his face crushing the side of his head between his foot and the concrete. The complaint thus effectively alleges that the principal's and assistant principal's observation of Timothy gave them reasonable cause to believe that an aggravated battery had occurred, thereby giving rise to a ministerial duty to report the incident under OCGA § 20-2-1184 (b). The Bajjanis claim that because of these defendants' failure to do so, they are chargeable with negligence per se.

> [G]enerally, negligence per se arises when a statute or ordinance is violated. The violation of certain mandatory regulations may also amount to negligence per se if the regulations impose a legal duty. OCGA § 51-1-6 provides: "When the law requires a person to perform an act for the benefit of another or to refrain from doing an act which may injure another, although no cause of action is given in express terms, the injured party may recover for the breach of such legal duty if he suffers damage thereby." Assuming that a violation of a statute or mandatory regulation has occurred, before negligence per se can be determined, a trial court must consider (1) whether the injured person falls within the class of persons it was intended to protect and (2) whether the harm complained of was the harm the statute was intended to guard against. Finally, if the court finds negligence per se, the plaintiffs must then demonstrate a causal connection between the negligence per se and the injury. And it is generally a jury question as to whether or not such negligence proximately caused the injury.[19]

Surely Timothy, as one of the high school students, was within the class of persons sought to be protected by the reporting requirement of OCGA § 20-2-1184. Aggravation of Timothy's injuries by reason of the delay in medical treatment is the harm of which the Bajjanis complain as a result of the defendants' failure to comply with the statute. Because reporting such an incident to the school superintendent, the district attorney, and the police would inexorably lead to the summoning of medical assistance, a jury could find a causal

---

[19] *Hubbard v. Dept. of Transp.*, 256 Ga. App. 342, 349-350 (3) (568 SE2d 559) (2002) (citations and punctuation omitted).

connection between the school personnel's failure to report the incident and Timothy's aggravated injuries. Therefore, the Bajjanis' claim against defendants for failure to comply with the statutory reporting requirements should not have been dismissed.

3. The Bajjanis also contend that the trial court erred in dismissing their complaint concerning the failure of school personnel to immediately obtain medical care for Timothy.

The trial court, citing *Teston v. Collins*,[20] concluded that "decisions of local school personnel regarding what amount of medical treatment should be provided to an injured student necessarily involve the application of personal deliberation and judgment and are therefore discretionary."

It is true that decisions made by school employees with regard to seeking medical care for students have been generally classified as discretionary because they entailed examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed.[21] We, nonetheless, recognized in *Cantrell v. Thurman*[22] that a governmental unit having custody of an inmate has a ministerial duty to provide the inmate with adequate medical attention although, once that is done, the determination of what medical treatment to provide is discretionary. Surely public school officials charged with responsibility for the care of our children should be similarly bound. The Bajjanis' complaint alleges that the principal and assistant principal found Timothy lying unconscious on the ground bleeding profusely from his nose and mouth; and that they did nothing but move him to the clinic where the school nurse simply cleaned him while he lay in an unconscious to semi-conscious state, bleeding excessively, moaning in pain, and unable to say or remember what had happened to him. Under these particular facts and circumstances, a jury could find either that the defendants failed to provide Timothy with any medical attention in breach of a ministerial duty on their part to do at least that, or that the care provided was so inadequate as to amount to no care at all.

And even if the decisions about whether to provide medical care were classified as discretionary rather than ministerial, the Bajjanis allege in their complaint that at North Gwinnett High School, discouragement from accurately reporting incidents of school violence took the form of an official mandate by school administrators whereby teachers were instructed never to call 911 for any injury on the school grounds so that the school would not be categorized as

---

[20] 217 Ga. App. 829 (459 SE2d 452) (1995).
[21] Id. at 830-831 (1).
[22] 231 Ga. App. 510, 514 (4) (499 SE2d 416) (1998).

"persistently dangerous" under the No Child Left Behind Act. Thus, as to this claim, the Bajjanis have alleged wilfulness and corruption as well as malice ("deliberate intention to do wrong").[23] Therefore, the complaint still alleges circumstances under which a jury could find immunity defenses abrogated as to discretionary as well as ministerial actions.

*Judgment reversed. Johnson, P. J., Blackburn, P. J., Barnes and Mikell, JJ., concur. Ruffin, C. J., concurs fully and specially. Andrews, P. J., dissents.*

RUFFIN, Chief Judge, concurring specially.

Although I agree fully with what is said by the majority, I write separately to share my observations regarding the "No Child Left Behind" legislation.[24] This case amply illustrates bad consequences flowing from good intentions. With the admirable goal of protecting our students, the federal government crafted legislation requiring states to determine when a school has become dangerous.[25] The State, in turn, enacted rules and regulations requiring, inter alia, that local school systems report criminal offenses to the Department of Education.[26] However, the schools face dire consequences for reporting such offenses, including being labeled as "persistently dangerous" after which the school would have to notify all parents of such label and permit any and all students wishing to leave to transfer to a different school.[27] This scheme — well-intentioned though it may be — led to the current situation: a school not only failing to report crimes against students, but also failing to seek appropriate medical attention for injured students. In other words, the legislation produced the exact opposite of the result intended, and it increased the threat of harm to our children.

The next question we must answer is what are the legal consequences of the defendants' actions? In this regard, I note that under OCGA § 20-2-1184, teachers and other school employees are required to report certain criminal acts, including aggravated assault, to the principal, who then is required to "immediately" report the incident to the appropriate authority. In a related statute — OCGA § 20-2-1185 — the school is required to prepare a safety plan.

Here, the record shows that, as a practical matter, Gwinnett County implemented a de facto "plan" in which crimes against

---

[23] *Merrow v. Hawkins*, supra, 266 Ga. at 391.

[24] See 20 USCA § 6301 et seq.

[25] See 20 USCA § 7912.

[26] See Ga. Comp. R. & Regs. r. 160-4-8-.16 (2) (a).

[27] See Ga. Comp. R. & Regs. r. 160-4-8-.16 (1) (d), (2) (c).

students would not be reported, a plan that countermanded a legislative mandate. And having implemented such a plan, I do not think the school district, board of education, and employees should be able to shield themselves from the consequences under the doctrine of immunity, either official or sovereign.

ANDREWS, Presiding Judge, dissenting.

I must respectfully dissent.

1. As to Division 1 of the majority, as stated in *Leake v. Murphy*, 274 Ga. App. 219, 224 (1) (617 SE2d 575) (2005) "[i]f the present lawsuit alleged that the defendants had developed an inadequate plan and that the plan's inadequacies resulted in [the student's] injury, the defendants would be entitled to official immunity. It is the total absence of any plan which precludes dismissal of the lawsuit."

As stated in the trial court's order, although the complaint alleged a failure to produce a safety plan, at oral argument on the motion for judgment on the pleadings, plaintiffs' counsel "clarified during argument that the allegation is not that there was no school safety plan created, but, instead, that the plan was grossly inadequate."

Therefore, the Bajjanis are judicially estopped to argue before this Court that, because there is no copy of the safety plan in the record, the case must be reversed pursuant to *Leake,* supra. See *IBF Participating Income Fund v. Dillard-Winecoff, LLC*, 275 Ga. 765 (573 SE2d 58) (2002); *Glover v. Ware*, 276 Ga. App. 759 (624 SE2d 285) (2005).

I believe the Superintendent and members of the Board of Education are clothed with official immunity because deciding on the contents of the plan is discretionary. *Leake,* supra.

2. Regarding Division 2 of the majority, I believe that Timothy was not within the class of persons sought to be protected by this reporting requirement nor were his injuries the harm sought to be protected against.

The majority states, without citing any authority for the proposition, that "[b]ecause reporting [of] such an incident to the school superintendent, the district attorney, and the police would inexorably lead to the summoning of medical assistance, a jury could find a causal connection between the school personnel's failure to report the incident and Timothy's aggravated injuries."

Such a conclusion, however, is neither logical nor consistent with proximate causation analysis.

> An injury or damage is proximately caused by an act or a failure to act whenever it appears from the evidence in the case that the act or omission played a substantial part in

bringing about or actually causing the injury or damage and that the injury or damage was either a direct result or a reasonably probable consequence of the act.

(Citation omitted.) *Ponder v. State*, 274 Ga. App. 93, 95 (1) (616 SE2d 857) (2005).

Merely failing to report the assault so that it could be considered in determining whether this school should be deemed "persistently dangerous" for purposes of allowing students to transfer to a safer school could not, as a matter of law, have played a substantial part in Timothy's injuries.

Therefore, I believe the trial court correctly granted defendants' motion for judgment on the pleadings on this claim.

3. Regarding Division 3 of the majority, I believe that *Teston v. Collins*, 217 Ga. App. 829 (459 SE2d 452) (1995), controls. *Cantrell v. Thurman*, 231 Ga. App. 510 (499 SE2d 416) (1998) cited by the majority, involved the Eighth Amendment, 42 USC § 1983, the State Tort Claims Act, and other legal theories, none of which are involved in this case.

Regarding the Bajjanis' allegations of actual malice, " '[i]n the context of official immunity, actual malice means a deliberate intention to do a wrongful act [and] such act may be accomplished with or without ill will and whether or not injury was intended.' *Adams v. Hazelwood*, 271 Ga. 414, 415 (2) (520 SE2d 896) (1999)." *Meagher v. Quick*, 264 Ga. App. 639, 645 (3) (594 SE2d 182) (2003). See also *Caldwell v. Griffin Spalding County Bd. of Ed.*, 232 Ga. App. 892 (503 SE2d 43) (1998) (physical precedent only).

I agree with the trial court and appellees that, although it was alleged that the intention of the superintendent and board members was to create an environment that amounted to a dangerous condition, creation of a climate in which injury can occur does not meet the standard for actual malice. *Meagher*, supra at 645 (3); *Caldwell*, supra. Nor is there any allegation of deliberate intent to cause harm to Timothy by the principal, assistant principal, and nurse. Therefore, I believe that the grant of the motion to dismiss on this ground was not error.

DECIDED MARCH 30, 2006 —
RECONSIDERATION DENIED APRIL 14, 2006 — 

*Carothers & Mitchell, Richard A. Carothers, Cheryl Benton Reid*, for appellants.

*Thompson & Sweeny, E. Victoria Sweeny, Stephen D. Pereira, Davidson & Tucker, Gerald Davidson, Jr.,* for appellees.